# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
## January 8, 2013 Session

## STATE OF TENNESSEE v. ANTONIOUS JAMAL BROWN

**Appeal from the Circuit Court for Gibson County**
**No. H8946      Clayburn Peeples, Judge**

---

**No. W2012-01362-CCA-R3-CD  -  Filed May 6, 2013**

---

The Defendant, Antonious Jamal Brown, challenges the sufficiency of the evidence supporting his jury conviction for first degree murder.  Specifically, he contends that there was insufficient evidence presented to prove that he shot the victim and that he did so with premeditation.  After reviewing the record and the applicable authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Harold R. Gunn, Humboldt, Tennessee, for the appellant, Antonious Jamal Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Garry Brown, District Attorney General; Jerald Campbell and Jason Scott, Assistant District Attorneys General; for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

This case arises from the November 5, 2009 shooting death of Vincent Brown ("the victim").  As a result of that investigation, the Defendant was indicted for first degree premeditated murder and aggravated assault on March 1, 2010.  His trial was held on February 15, 2012, and the following evidence was presented.

Kanesha Graves testified that between 3:00 p.m. and 3:30 p.m. on November 5, 2009, she saw the Defendant and the victim on Craddock Street, the intersection where the crime

occurred; the Defendant was driving a white car. Ms. Graves was talking to both men, and when they finished their conversation, the Defendant walked towards his car, and the victim walked the opposite way. The Defendant then turned away from his car, "pulled his pants up and went the other way toward [the victim]." Then, as if he had changed his mind, he went back to his car and sped off before Ms. Graves could start her car. Ms. Graves testified that neither of the men seemed angry.

Sharlice Bradford testified that she was inside her mother's home at 1007 North Fifth Avenue when she heard a noise outside; it sounded like a firecracker. She testified,

> So I walked toward her front door. And when I walked to her front door it was a car coming up in the yard and it was going out of the yard.
> It got to the stop sign on the corner of Fifth and Maclin Street. It went up the corner [on Maclin]. It came back, pulled back in front of the yard where the young man was laying.

Then, the driver, later identified as the Defendant, got out of the car, turned the victim over, got something out of his pocket, and turned the victim back over. He had something black in his hand and laid it beside the victim. The Defendant got into his car and went up the street on Fifth and Craddock.

Ms. Bradford testified that she did not notice the victim lying there until the car returned. Ms. Bradford further testified that the car was a white Dodge Neon and identified the car in the photograph presented to her by the State[1] as the car that drove into her mother's yard. She stated that she could not identify the Defendant because he never looked up or made eye contact with any of the onlookers, even after her mother told him not to touch the body, which was lying in the lot on the side of the house. Ms. Bradford went inside and called 911.

Dorothy Smith, Ms. Bradford's mother, testified that she was cooking when her daughter told her to come to the door to see a car that was going across her yard. When she came to the door, she saw the Defendant returning to the scene, and he went toward the victim who was lying in the yard. This was the first time she noticed the victim. Ms. Smith testified that the Defendant approached the victim, and she told him not to move the victim. The Defendant did not respond; he just got back in the car and drove off.

Jonathan Wilson, an officer with the Humboldt Police Department (HPD), testified that he was the first officer to respond to the scene, that he arrived at approximately 3:45

---

[1] This was a photo of the car that the Defendant was driving when later apprehended by the police.

p.m., and that the ambulance had not yet arrived. He stated that the victim was lying in the yard, a few feet from the road, and that there was a gun laying on the victim's stomach. Officer Wilson determined that the gun had been fired. He then sent the suspect's description and vehicle information out over the police radio: white Dodge Neon, black male driver.

Joshua Carter, an investigator with the HPD, testified that he was on patrol when he received the initial call about the incident. Shortly thereafter, information on the suspect's car was dispatched on the police radio. Approximately ten to fifteen minutes later, Inv. Carter saw a white Neon with a busted windshield. He proceeded to stop the car because it fit the description from dispatch, but the car sped up. Inv. Carter turned on his blue lights and pursued the car. He was a few blocks away when the black male exited the car and "took off running." Inv. Carter identified the suspect as the Defendant. After backup arrived, the Defendant was located in a garbage can with some cell phones, approximately 100 yards from the Neon.

Raynard Buchanan, an investigator with the HPD, testified that he took photos of the crime scene and helped collect the gun shot residue (GSR) kits from the Defendant and the victim. Inv. Buchanan testified that he went through both the Defendant's and the victim's phones and that there were seven short phone calls between them within an hour prior to the incident. Inv. Buchanan said that the victim was not dead when officers first responded to the scene, but the victim died a day or two later. He took DNA swabs from the victim two days after the incident.

Deandre Perry testified that he was in the car with the victim thirty minutes before the shooting. Mr. Perry stated that there had been a white car following him when he dropped the victim off on Fifth Street. He had previously identified the white Dodge Neon as the car that had been following them but did not know who was driving the car.

Prentiss Johnson testified that he was with the victim the night before the incident. The victim said that there was trouble between him and the Defendant and that he did not feel comfortable walking or being by himself. Mr. Johnson stated that he would give the victim rides and that the victim was on the way to Mr. Johnson's house when the incident occurred.

Karen Chancellor, the chief medical examiner for Shelby County, testified as an expert in forensic pathology. She stated that the victim had an entrance and exit wound to the head caused by a gun shot and that this was the cause of his death. The gun shot was close range, fired approximately two to ten inches away from the victim's head. The victim had various other injuries consistent with being a day old or less. On cross-examination, Ms.

Chancellor testified that it was possible that the victim could have shot himself but that she did not have any evidence to support that theory.

Sherida Dowell testified that she saw the victim go into Jerry Fitzgerald's house and that she saw Aaron Brown get out of a white vehicle and go into Mr. Fitzgerald's house behind the victim. Approximately ten minutes later, she heard a gun shot and went to the door. Ms. Dowell testified that the car that was in front of Mr. Fitzgerald's house was now on Fifth Street, and the Defendant was in the car. She then saw the Defendant go over to the body, and he appeared to be feeling on the victim, but she could not tell exactly what he was doing because she was a distance away. Ms. Dowell stated that Michael Gooch, her child's father, was not present when the incident occurred.

Tory Phillips testified that he was walking down Craddock Street when he heard a gun shot. He then heard a "big thud sound" and saw the end of a white car turn the corner. Mr. Phillips testified that the Defendant had approached him a few days earlier and asked if he knew anybody that would sell him a gun.

Tony Williams, an investigator with the HPD, was the lead investigator in this case. He testified that he interviewed the Defendant on three different occasions to get the Defendant's version of the events involving the November 5, 2009 incident. The Defendant did admit that he was the driver of the white Neon and that the phones found with him in the garbage can were his. In the first interview, the Defendant said that he was driving down the street when he was flagged down and that two unknown men jumped in the car. He was robbed of $100 at gunpoint. He then blacked out and the car rolled forward, possibly hitting one of the men. The Defendant said that he got out of the car and rolled the victim over to look for his money and that was when he saw the gun fall out of the victim's pocket.

The next day, Inv. Williams sought to get a second statement after he had talked to witnesses and discovered that the Defendant laid something near the body, but the only thing found next to the body was the gun. Inv. Williams also asked the Defendant about whether his DNA or fingerprints would be found on the gun, and the Defendant told him that he brushed the gun with the back of his hand when he flipped the victim over to retrieve his money. The Defendant also told Inv. Williams in the second interview that the victim turned around and "probably was getting ready to shoot at [him]" and that was when he hit the victim, his window busted out, and the victim shot the gun. However, the Defendant stated that he was going about five miles per hour and that he only bumped the victim. The Defendant stated that he did not recall whether the victim "went . . . flying through the air."

The third statement was taken at the Gibson County Correctional Facility on November 9, 2009. According to the Defendant, he was standing in the street talking to the

victim and another man when the victim robbed him. The victim flagged down someone in a gray Lumina and gave them some money, and they drove off. He asked for his money back, and the victim told him to "charge it to the game." The Defendant then stated, "[a]fter I came back I grabbed the bag[2] to see what it was. It was a plastic bag with three small plastic bags in it. I went to my grandmother's house. I've been robbed and told several people and gave the plastic bag to [a male there]. This took place after I hit the body." The third statement was not recorded, at the Defendant's request. However, Inv. Williams hand wrote the statement, read it to the Defendant to ensure that it was exactly what he had said, and had him sign it.

Inv. Williams stated that during his investigation, Mr. Phillips came to talk to him about the Defendant's approaching him about purchasing a gun and that Mr. Phillips's testimony was consistent with what he had told him previously. Inv. Williams testified that he also spoke with Ms. Dowell, that she told him several times that Mr. Gooch was not present when the incident occurred, and that her testimony was also consistent with the statement she gave him during her initial interview.

Charles Hardy, an agent in the DNA unit with the Tennessee Bureau of Investigation (TBI), testified as an expert in DNA analysis. Agent Hardy analyzed the DNA in this case and offered the following findings: the victim's DNA was found on the windshield of the Defendant's car; a beer bottle found in the car contained the Defendant's DNA; and the DNA found on the steering wheel of the car did not match the victim or the Defendant. Agent Hardy also analyzed the gun and found DNA profiles suggesting two contributors: the victim, a minor contributor, and an unidentified person. The Defendant was excluded as a contributor.

James Russell Davis, II, a special agent and forensic scientist for the TBI crime laboratory in Nashville, testified as an expert in GSR analysis. He explained that GSR analysis involves the testing of three elements "that are not natural of the human body": antimony, barium, and lead. Agent Davis analyzed the Defendant's GSR test, and while all three elements were found on the Defendant's hands, he tested inconclusive for GSR. The Defendant's antimony level tested at the threshold level,[3] but the Defendant's lead and barium levels were low. However, Agent Davis explained that changing clothes, wringing your hands, or physical activity – such a running from the police and hiding in a garbage can

---

[2]Apparently, the victim had a black bag on his person when he was hit by the Defendant's car.

[3]Agent Davis explained that there are minimum levels of each element required to be found to definitively say that a person fired a gun and did not pick up the elements from any other sources, especially if the presence of the elements can be otherwise explained.

– could reduce the quantity of the elements. Agent Davis testified that both the victim's hands and the car tested negative for GSR.

Rachel Autry, a paramedic for Gibson County, testified that she transported the victim to the hospital and that no one washed or otherwise cleaned the victim's hands while he was in her care.

Michael Gooch testified for the defense. Mr. Gooch testified that he witnessed the November 5, 2009 shooting between 2:00 p.m. and 3:00 p.m. while standing on Ms. Dowell's porch on Craddock Street. He stated that Ms. Dowell was his child's mother and that she had just returned from picking their child up from Head Start.[4] Mr. Gooch testified that he saw "[a] white car come down the street and make a right and the [victim] pulled out a gun and he swerved and then [the victim] went flying in the air and the gun went off." Mr. Gooch said that he was not certain why Ms. Dowell told officers that he was not at her home on that day but stated that it could have been because, at that time, he was on the run from police for aggravated assault and reckless endangerment charges, to which he later pled guilty. On cross-examination, Mr. Gooch admitted that he only recently came forward with this information because, initially, he did not want to get involved.

The Defendant testified in his own defense. According to the Defendant, the victim called him on November 5, 2009, asking whether he was picking up Aaron Walker. The Defendant stated that he did not know the victim. Later, he was driving down Maclin Street to pick up Aaron Walker, and the victim was standing in the street and flagged him down. He gave the victim a ride to Jerry Fitzgerald's house. "When [he] stopped that's when [the victim] robbed [him] with the black gun [the victim] had." The victim then called someone, who the Defendant believes was Kanesha Graves because she and her husband pulled up in a gray Lumina. The Defendant said that he asked the victim, "can I get that?" and the victim gestured towards his concealed weapon. The Defendant stepped back, and the victim "walked backwards." The Defendant then walked to his car; Kanesha Graves left before he did. He left the scene but returned after saying a prayer about getting his money back, driving approximately five miles per hour. As the Defendant was about to approach the victim, the victim aimed the gun at him. The Defendant stated, "I seen my life flash in front of my eyes. Not only my life but the innocent bystanders of people that I went to church with back in the day in that area life flashed, too." He took his hands off the steering wheel, and the car went toward the victim and into the grass. The Defendant explained that he mistakenly told officers that he "blacked out" but that he meant to say that he freaked out, further explaining that he "was in Special Ed all [his] life" and that he thought the two phrases meant the same thing. After hitting the victim, the Defendant went to the corner

---

[4]Head Start is a pre-school program.

store to see if he had been shot; he was uncertain because the muffler on the car had a hole in it. That was when he saw "Brittany" run to the body. The Defendant said,

> . . . the kindness of my heart, I wanted to go back and help the man that just robbed me and tried to kill me, so immediately I turned the car around right there in the middle of the road and drove to the body. He was turned already over and I reached down. The woman said, "I already called the police and the ambulance." I was like, "Yes, ma'am."

The Defendant grabbed the victim's coat, and it looked like a gun fell out of the victim's pocket; he let the coat go. The Defendant said that he wanted to reach for the gun for his safety because he thought the victim was playing. The gun had a "warm sensation on it," and he freaked out; "[a]ll the witnesses [were] looking at [him, and e]verybody out there looking at me." The Defendant explained that he already had a black bag in his hand, so he kept it because he did not want anyone to think he was planting anything on the victim. The victim also had a black bag on him containing a white powder, and the Defendant apparently took this bag as well. The Defendant said that he took the bag to his grandmother's house because he did not want the police to find him with drugs on him. The Defendant said that his cousin called and told him that "they're saying [he] so called supposed to have ran over a Gangster Disciple"[5], and the Defendant was afraid of what the Gangster Disciples might do to him. He also did not want to go to jail, so he ran.

The Defendant said that he did not want to talk when they interviewed him the first time and that the officers threatened him with life imprisonment. He was given a second interview because officers said they lost the first interview, and the Defendant said that he decided to tell them everything he did not tell them in the first statement. The Defendant said that officers "popped up" at the jail for the third interview and that they were going around the jail asking people about him.

The jury convicted the Defendant of first degree premeditated murder and aggravated assault. The Defendant was sentenced to life with the possibility of parole on the murder conviction. On April 9, 2012, the Defendant was sentenced to six years on the aggravated assault conviction, to be served consecutively to the murder conviction.[6] The trial court explained that consecutive sentencing was imposed because the Defendant was on probation when the incident occurred; the Defendant's probation on those cases was revoked.

---

[5]The Gangster Disciples is a gang.

[6]The victim's mother testified at the sentencing hearing and said that she knew the Defendant; he had been over to her house. She said that she had forgiven him and only wanted him to apologize.

ANALYSIS

The Defendant challenges the sufficiency of the evidence supporting his conviction for first degree premeditated murder.[7]   Specifically, he argues that the evidence is inconsistent with him shooting the victim and that the evidence regarding premeditation was not sufficient to support his conviction.  The State responds that the evidence presented was sufficient for the jury to conclude that the Defendant committed first degree premeditated murder.

*A. Sufficiency of the First-Degree Murder Evidence*

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of

---

[7]The Defendant states in the issue portion of his brief that he is challenging both of his convictions; however, the argument section of the brief only addresses the first degree murder conviction.  As such, the Defendant has waived review of his aggravated assault conviction.

the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of first degree premeditated murder, which is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "'[P]remeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). A killing is intentional when "a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18). Thus, the State must prove that a defendant acted with premeditation and the intent to kill another to support a conviction of guilt for first degree murder.

*1. Evidence that the Defendant Shot the Victim*

The Defendant argues that the evidence is inconsistent with the "State's theory of the crime . . . that the victim was shot after the defendant turned his car around, stopped, got out, walked to the victim, shot him, got back in the car and left." The Defendant explains that the medical examiner testified that the gun was approximately two to ten inches from the victim's head when he was shot and that "[t]his inference can only mean that the defendant shot the victim while out of the car." However, the Defendant explains, "[t]he State's witnesses refute the shooting when defendant was out of the car[,] and there is no inference that defendant ever shot the victim while out of the car."

We first note that we are aware of no authority that binds the jury to the State's theory of the crime. However, it is well-settled that "[a] guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in favor of the prosecution's theory of the case." State v. Wilson, 211 S.W.3d 714, 718 (Tenn. 2007) (citing Bland, 958 S.W.2d at 659). As fact-finder, the jury's role is to consider the evidence and determine the credibility of the witnesses and the weight and value to give their testimony. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier [ ] of fact"). The jury is free to accept portions of a witness's testimony and reject others. See State v. Adams, 45 S.W.3d 46, 56 (Tenn. Crim. App. 2000); State v. Gilbert, 612 S.W.2d 188, 190 (Tenn. Crim. App. 1980) ("The jury was entitled to accept that part of the defendant's proof they felt was consistent with truth and reject that portion they believed originated in falsity."); see also State v. Winters, 137 S.W.3d 641 (Tenn. Crim. App. 2003) perm. app. denied, (Tenn. 2004).

The following evidence was presented from which the jury could reasonably conclude that the Defendant shot the victim: that the Defendant approached Tory Phillips days prior to the incident and inquired about purchasing a gun; that witnesses heard a gun shot; that a witness saw the Defendant return to the scene after hitting the victim with his car and place a black object next to the victim; that there were elements found in gun shot residue on the Defendant's hands and not on the victim's hands; and that circumstances suggest the shooter was either the Defendant or the victim and the medical examiner testified that there was no evidence to support the Defendant's assertion that the victim shot himself. The jury obviously discredited the Defendant's version of the events and resolved any discrepancies in the evidence in favor of the State, and we will not second guess the jury's factual determinations. See State v. Anthony Whited, No. M2010-00612-CCA-R3-CD, 2011 WL 6892352, at *6 (Tenn. Crim. App. Dec. 27, 2011) perm. app. denied, (Tenn. May 16, 2012).

## 2. Evidence of Premeditation

The Defendant also argues that the evidence presented at trial did not establish the existence of premeditation. According to the Defendant,

> [t]he only inference the jury could conclude premeditation is Tory Phillip's testimony that the defendant wanted to buy a pistol a few days earlier at Phillip's house. . . . No gun belonging to the defendant was found at the scene or later on the Defendant. The only gun that was found was one by the victim with a jammed shell in the chamber. . . . The other State witnesses testified to no shot was heard or made by the defendant while out of the car. . . . From this, premeditation can not be found prior to the act itself.

However, we disagree.

The presence of premeditation is a question for the jury, and "[a]lthough the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing." Millsaps, 30 S.W.3d at 368 (citing Bland, 958 S.W.2d at 660); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995)). Furthermore, "[b]ecause premeditation involves the defendant's state of mind, concerning which there is often no direct evidence, Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence." State v. Davidson, 121 S.W.3d 600, 614-15 (Tenn. 2003) (citing State v. Brown, 836 S.W.2d 530, 541 (Tenn.1992)). Our supreme court has used the following factors to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) evidence of procurement of a weapon; (5) the manner of the killing, including the appellant's using a deadly weapon upon

-10-

an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (6) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Davidson, 121 S.W.3d at 614; State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998); Bland, 958 S.W.2d at 660; State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993); see also State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). These are but some of several factors that may be considered on the issue of premeditation. See Davidson, 121 S.W.3d at 615 ("These factors, however, are not exhaustive."); Bland, 958 S.W.2d at 660.

Considering the factors above, several facts support a finding of premeditation when viewed cumulatively in the light most favorable to the State. The Defendant approached Tory Phillips a few days before the incident and inquired about purchasing a gun. Prentiss Johnson was with the victim on the night before the incident, and the victim told Mr. Johnson that there was trouble between him and the Defendant and that he did not feel comfortable walking by himself. The Defendant and the victim exchanged several phone calls shortly before the incident. Later, the Defendant gave the victim a ride in his car, and he was the last person to see the victim alive. Shortly after the victim got out of the Defendant's car, he assaulted the victim with his car, left, then returned to the scene. At some point, the Defendant shot the unarmed victim and placed the murder weapon next to the victim's body. By the Defendant's own admission, he then took a bag from the victim's person and left the scene without looking at any of the onlookers. When Officer Carter attempted to stop the Defendant's car, the Defendant sped up and, ignoring the siren and blue lights, fled from Officer Carter; he was later found hiding in a garbage can. We conclude that, given the evidence presented, a reasonable jury could have found that the Defendant shot the victim and that he did so with intent and premeditation.

CONCLUSION

Based upon the foregoing reasoning and authorities, we conclude that the evidence presented at trial was sufficient to support the Defendant's conviction for first degree premeditated murder.

_____
D. KELLY THOMAS, JR., JUDGE